CRABB, J.
delivered the opinion of the court. The judgment in this case, depends upon the construction of the act of assembly of 1820, ch. 11, sec. 2, 3, 4 and 5, providing for the redemption of real estate and negroes, sold under execution at the instance of a creditor, at any time within two *85 years after such sale, by the debtor or other bona fide ere-ditora.
The act is very inartificially wordect, and it is extremely difficult to ascertain what, in some resp.ects, was the intention of the legislature. Taking into view the different sections which have been referred to, in connection with each other, it is sufficiently apparent, that the general assembly did not intend, (what they could not be p'resumed to intend,) without very clear, evidence, to require the surrender, or reconveyance of property purchased at execution sale, upon other than equitable terms. All agree, that the purchase money, with the interest prescribed by the act, should be refunded to the purchaser. But has he not an equal right to retain the purchased property, until any debt is refunded, which is legally ascertained to be due to him, and any debt which has legally been ascertained to be due to another, and which, by the provisions of the act, he was under the necessity of discharging? Can it be possible, that a person who was a creditor to the amount of -500 dollars, and was vigilant, and obtained a judgment and sued out execution, and bought in a negro for one hundred dollars, shall be obliged to surrender him to the debtor,-upon payment of one hundred dollars with interest? He would not be required to give up his legal advantages, under such circumstances, to another creditor, by the express provision of section 4 of this act; neither should He be liable to such injustice, at the instance of the debtor^'
The purchaser at an execution sale, in justice, a's well as upon principles of public policy, is regarded with a favorable eye.. He is, from the time of the purchase, clad in the garb, and entitled to all the privileges of the creditor, under whose judgment he claims, to the extent of the purchase money. And this is the most favored creditor, because in this instance the most vigilant; and besides, the purchaser has privileges peculiar to himself — and the true construction of the act, will entitle him to be refunded all money he has necessarily paid under its provisions.
If a Iona fide creditor, with a debt legally ascertained to be due, applied to him, and made him the tender prescrib *86 ed, he was obliged either to surrender his advantage, and Up negr0) or pay the debt, why should he not be refunded this money also, before the debtor shall redeem? It makes no substantial difference, how the money was paid to the creditor, or what particular forms were resorted to, to evidence itspayment — whether a receipt was given, or the, payment was assigned, so the substantial fact is proved, that the money was actually paid, under the circumstances designated in the act.
But has not Jamison mistaken his remedy? Is an action of trover maintainable? Was it the intention of the general assembly, that when a debtor, or bona fide creditor, makes the tender, the purchaser is ipso facto, divested of his legal title, and that the legal title vests, by force of the tender, in the person making it? It is believed that no such consequence will follow from the words, or from the spirit and policy of the act. The language of the 2d and 3d sections, clearly excludes the idea of this change of legal ownership by mere force of the tender. The first section provides, that upon payment or tender, it shall be the duty of the claimant to reconvey to the debtor. The second section directs, that upon payment or tender, it shall be the duty of the purchaser, or person claiming under him, to convey the interest purchased to the bona fide creditor, &c.
If the tender had been designed to operate, as counsel argue, why would the general assembly have spoken of a subsequent act that was to be done, the making a conveyance or reconveyance? Give no strained construction lo the phraseology, and it means, that upon payment or tender, it shall be the duty of the purchaser, to make to the debtor, or the bona fide creditor, a deed of bargain and sale, in the case of real estate; and a bill of sale, in the case of slaves, executed with the solemnities required by law. It is said, that whatever may he necessary.as to real estate, no written transfer of interest is requisite to pass title to slaves. The answer is, ihat a bill of sale for slaves, is directed in all cases, and for some purposes is indispensable. Without it. or at least sometimes in lieu of it, the title re *87 mains in the vendor, or against the creditors of the subsequent purchasers from the vendor.
It is impossible to liken this case to those of mortgages or pledges: they are considered as simply securities for the payment of the debt. The mortgagee and the person making the pledge, are looked upon as the real owners of the property, at leastuntil condition broken. In the case of a mortgage or pledge, doubtless by the tender of the money due before forfeiture, the condition is saved, and the mortgager becomes the legal owner to every intent. (Co. Littleton 209 A, Wade’s case 5 Rep.; Bacon’s Abr. Bailment D.
But is the purchaser at execution sale, by the provisions of this act, converted into a mortgagee or pawnbroker? Has he a mere security for his debt? Suppose the negro were to die in the possession of the purchaser, whose loss would it be? Would he have a remaining claim for the money paid against the debtor, as a mortgager or pawnbroker would? It is presumed not. - Why does the act speak of sales and reconveyances, if the purchaser was merely to have a lien on the property for security? Suppose a bill filed to redeem a negro, upon the principles which govern in the case of mere securities, would it not be considered hard, and savoring of oppression, for the purchaser to ask both interest on his money and the services of the slave? And why should not equity, which relieves against forfeitures, entertain a bill for redemption after the time elapsed, if the sale is to be viewed as a mortgage? The fact is, the act in question is sui generis, and the rights arising under it of a peculiar nature.
The purchaser is the legal owner of the property, sold, under execution by virtue of the deed or bill of sale from (he sheriff, as heretofore; subject to the equitable right of the debtor, &c. to reclaim, or repurchase it, upon the terms specified in the act.
If the purchaser refuses to reconvey, the debtor, or other bona fide creditor, can have recourse to that forum which can better carry into effect the provisions of the act, than any other — a court of equity. The plaintiff must there aver bis tender, his having been always ready to pay, and must *88 bring the money into court for the benefit of the purchaser. jn that court an account can be taken, and the amount of the purchaser’s, or creditor’s judgments be ascertained. The facts will all be set out in the pleadings, and the proper decree will be rendered, in order to settle the rights of the conflicting parties according to the act. It will appear ever afterwards upon record, what claims are extinguished, and what survive. In a word, we are satisfied, that a court of equity is the only tribunal where justice can be done in such cases. Arguments, drawn from policy and ah incon-venienti, point to it as the forum, where such complaints should be instituted.
Let the judgment be reversed, and the cause remanded to the circuit court, with directions to that court to charge the jury on the trial, that an action of trover cannot be sustained, under the circumstances stated in the bill of exceptions.
Catrou, Judge.
If Hawkins had a lien on the slave, by virtue of the act of 1820, ch. 11, for either of the three demands, above set forth, in addition to the sum by him paid at the execution sale, with 10 per cent, interest thereon; then Jamison was bound to tender the full sum which formed such lien, before he could defeat the legal title of Hawkins to the slave, and vest in himself a right, either at law or equity. For, although Hawkins might have claimed too much, yet, before his legal title could be defeated, Jamison was bound to tender what was really due, and formed a lien upon the negro. So soon as Hawkins claimed his judgment to be a lien, and bid'so much more for the property, his judgment was satisfied, and Jamison forever discharged therefrom. He asked Jamison to go to the house to settle the claims, wdiich the latter declined doing. Hawkins remarked to him, at the time the tender was made, (after stating the above claims,) you shall not redeem, unless you pay me all the above sums; or I will give you three hundred dollars for the negro, including the money tendered, and the other three small claims. This is the substance and effect of the conversation. Three hundred dollars was the value of the negro.
*89 The court below charged the jury — first, that Jamison had a right to redeem, by paying the original purchase money with interest, after the rate of ten per cent, per annum, without having been compelled to tender, or pay the amount of either of the above claims under the circumstances.
Secondly: that on the 102 dollars, with 10 per cent, interest being tendered, he had a right to sue at law, and that trover in such case would lie.
The court, by defendant’s counsel, was asked to charge to the raverse of both of the above propositions, which was refused. The jury found for the plaintifif Jamison — a new trial was moved for, but refused to be granted by the court. To all which a bill of exceptions was taken by the defendant, and an appeal in error brought to this court. This presents directly the question, 1st, will a tender of the purchase money, with 10 per cent, per annum interest thereon, by the debtor to the purchaser of his property at execution sale, defeat the legal title of the purchaser to the lands or slaves, and vest in the original owner and debtor a legal title to such lands and slaves; for the recovery of the possession of which, an action of ejectment, detinue or trover will lie? Or must a court of equity be resorted to, for the purpose of compelling the purchaser to reconvey the lands or slaves, upon being paid his purchase money, with 10 per percent, by the debtor? Or, in other words, had the circuit court jurisdiction in the above cause?
2d; Had Jamison a right to redeem the slave from Hawkins, by paying him the sum of 102 dollars with 10 per cent, thereon?
The second section of the act of 1820, cb. 11, authorizing redemption, provides, “that if the debtor pajr or tender the sum for which the property was sold, with 10 per cent, interest thereon, to the purchaser, or those claiming under him, within two years, the lands or slaves shall be reconveyr ed to the debtor.
By the third section, it is enacted, “that any bona fide creditor of the original owner, or debtor, may redeem from the purchaser lands and slaves, by paying the bid and 10 per cent, interest thereon. But the redeeming party shall *90 agree to credit the original owner 10 per cent, on the amount due from the debtor, to such bona fide creditor.”
Less than 10 per cent, cannot be bid; yet any sum over it may, should it be 10 per cent, or more. On the creditor offering to redeem, the purchaser may pay, or secure to be paid, on behalf of the original debtor, to the creditor, the amount he will advance on the original bid, and retain the lands or slaves purchased; on this being done, so much of the original debt is extinguished against the debtor.
The fourth section provides, “that if the purchaser is also a creditor of the original debtor, to the amount proposed to be advanced by the creditor, and agree to give credit for the amount offered to be advanced by the bona fide creditor to the debtor, he may keep the property, or surrender the same to the creditor at his election.” By this section surely the debtor stands upon no higher ground than a bona fide creditor. The meaning of the law must be, that if the debtor comes forward to redeem, the creditor, (who is also the purchaser,) may say to him, I have an unsatisfied debt against you, and bid 10 or 20 per cent, on my former bid, and give you credit — I redeem the property at that, says the debtor — I advance the balance of my debt, says the creditor — I still redeem, says the debtor; and here the matter ends.
1st. Had Hawkins a right to pay off the debts of Outlaw and Elder, when they offered to redeem? He clearly had by the third section of the act of 1820. The debts by the law itself were extinguished; and Hawkins, so soon as he had paid them, had a lien on the negro for their amount; nor could any act of Hawkins alter the law, or set up the debts of Outlaw or Elder. Indeed he did not treat the claims, otherwise than as forming a lien upon the slave, until after this suit in trover was brought, if he ever has done so.
In taking the assignment of the debts to himself, Hawkins acted as most other prudent men would have done; nor can it be seen, how in substance he ought to have acted differently. It matters not what he intended — the moment he took up tlie debts, they "were extinguished by the law, *91 and Jamison discharged therefrom. It is impossible Jami-son could be deceived by the conduct of Hawkins. Outlaw was sent by Jamison to redeem, and Elder had a judgment, which Hawkins paid off, and informed Jamison he had done so; and claimed a lien, when Jamison came to redeem; which, to my mind, he had a right to do — and that was the only means he had of obtaining payment from Jamison, of the sums paid for him to Outlaw and Elder. I am free from doubt — were it otherwise, the debtor would himself be subject to great aggression in such cases. For,'so soon as the two. years were expired, the purchaser would keep the property, and proceed to collect the debts from the debtor, which he had paid off to the other creditors, pursuant to the third section of the act of 1820.
It is contended, that no part of the law provides, that the •debtor shall be bound to pay up. the sum'so advanced to a bona fide creditor, by the purchaser, under the third section of the act, before the debtor can redeem from the purchaser ; and that the law was intended to benefit debtors, and should be liberally construed in their favor. To which it may be answered, that it is no where said in words, in the statute, that in such case where the purchaser has taken in another debt from abona fide creditor, the debtor shall be permitted to redeem. Yet the one construction or the other would manifestly violate the intention of the legislature, which was to leave it at the option of a bona fide creditor, or the debtor himself, to open the biddings, at any time within'two years, if there were other debts; or if there were no other debts, or there was no person disposed to advance ten per cent, on the purchase money to the credit of the debtor; that then he might redeem by paying ten per cent, interest on the money advanced at the execution sale.
Secondly. Hawkins had a judgment against Jamison for about 17 dollars, principal and interest, recovered in 1817. Had he (Hawkins) not a right to say to Jamison, I advance my whole judgment upon the negro, and will give you a discharge of the judgment; and before you redeem, you must pay the sumí have advanced over my original bid? It is believed Hawkins had an undoubted right to do this. *92 The time the tender was made, was the proper and only t¡me flaw kins could bid — then it was the biddings were opened; this Hawkins honestly and faithfully offered to do, if Jamison would go to the house with him, which was declined.
Having the misfortune to differ from my brother judges on the above points,* and therefore no decision can be made, I will not examine the point, whether a court of law has jurisdiction in the case of tender. Yet the inclination of my mind ever has been, that it has not. That the purchase was one, with liberty to repurchase; that the legal title to the lands or slaves, was vested in the purchaser, and could not be divested without a reconveyance. It very probably is so in case of lands. Whether the act of 1821, ch. 10, confers upon courts of law jurisdiction to give relief in detinue or trover for slaves, where a tender has been made, will be left open for future examination, when the court is full. The point is new, and of great importance. If there is a remedy at law, a court of equity ought not to interfere with that jurisdiction. It is hoped, when the cause is again argued, that this point will be well examined by the counsel.
Upon the re-argument of this'cause, at the present term of the court, and further consideration given to it, I am well satisfied that a court of law had no jurisdiction — that trover did not lie, and that a court of equity, in such a case as the present, alone has jurisdiction, for the reasons stated by judge Crabb, in the opinion of the other members of the court, with which opinion I concur. No conclusive opinion is intended to be expressed, whether any creditor, other than a judgment creditor, can redeem from the purchaser, it not being necessary in this case, and there being much doubt upon the subject.
JVhyie and Peck, judges, concurred.
Judgment reversed.

 This opinion was delivered by judge C. after a previous argument of this cause, at the January term, 1826, at which time there was a difference of opinion amongst the judges.—Reporters.